UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| CHRISTOPHER C. GRAY,<br><br>Plaintiff,<br>v.<br><br>GARRISON PROPERTY AND CASUALTY INSURANCE COMPANY,<br><br>Defendant. | CASE NO. 3:24-cv-06017-DGE<br><br>ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 21, 26) |

This matter comes before the Court on cross motions for summary judgment filed by Plaintiff Christopher C. Gray and Defendant Garrison Property and Casualty Insurance Company ("Garrison"). For the reasons explained below, Plaintiff's motion for partial summary judgment (Dkt. No. 26) is GRANTED in part and DENIED in part. Defendant's motion for summary judgment (Dkt. No. 21) is DENIED.

# I FACTUAL AND PROCEDURAL BACKGROUND

## A. Plaintiff's Property Loss and Insurance Policy

The facts underlying this case are largely undisputed. Plaintiff signed a lease to rent storage unit #1025 at Public Storage in Puyallup, Washington, on August 17, 2023. (Dkt. No. 22 at 21.) He and his wife stored some of their "high-valued items" at the storage unit while they were temporarily living at his in-laws' home. (*Id.* at 23.)

Plaintiff did not identify water damage, rodent damage, or other damage at his storage unit until he vacated on March 1, 2024. (*Id.* at 24.) When he arrived to load up a U-Haul with his possessions, he noticed the damage for the first time. (*Id.* at 24–25.) Plaintiff states his family's belongings, including mattresses, a couch, and furniture, were "soaked with water following a series of local rain and wind storms." (Dkt. No. 28 at 1.) When Plaintiff opened the storage unit and "started pulling things out[]" he realized there were also rat feces on the floor and in boxes. (*Id.*; Dkt. No. 22 at 25.) Plaintiff provided a video he took while unloading his storage unit that "shows the water damage [he] observed in [his] storage unit." (Dkt. Nos. 30 at 1; 31.) In the video, some of Plaintiff's items, including a mattress and couch cushions, appear wet. (Dkt. No. 31.) The wood ceiling and walls of the storage unit appear dry, though it is difficult to determine because Plaintiff's video did not linger long in those spots as he was filming. (*Id.*)

## B. Defendant's Investigation and Denial of Claim

At the heart of this matter is Plaintiff's renters' insurance policy, which was issued by Defendant and was in effect from June 17, 2023, through June 17, 2024. (Dkt. No. 28 at 1.) On March 1, 2024, the same day Plaintiff discovered the damage to his belongings, he filed a claim with Defendant, reporting the cause of loss as "'vermin infestations, mold/mildew, and water

damage.'" (Dkt. No. 23 at 2) (citation omitted). Alyssa Martinez, a Property Adjuster for Defendant, advised Plaintiff that his insurance policy would not cover loss caused by "exclusions," which included vermin. (*Id.*; *see also id.* at 10–11.) Martinez informed Plaintiff there "could be coverage for water damage, but additional investigation would be necessary to determine the cause of loss." (*Id.* at 2.)

Plaintiff declares Defendant did not send a claim representative to investigate the loss, which Defendant does not dispute. (Dkt. No. 28 at 2.) Though Martinez was assigned to Plaintiff's claim, she never personally inspected the storage unit. (Dkt. No. 23 at 1–2.) Martinez received "numerous photos" of the loss from Plaintiff, which apparently "confirmed the presence of water staining and mold" on his property. (*Id.* at 2.) Martinez did speak with Robin Higman, the manager of the Puyallup Public Storage facility, on March 8. (*Id.*; Dkt. No. 28 at 2.) Higman apparently informed Martinez that the Puyallup location "had been having issues with rat infestations for a while, including 'roof rats.'" (Dkt. No. 23 at 2.) Higman told Martinez the roof rats "could have created holes in the roof of Plaintiff's storage unit." (*Id.*) In her deposition, Higman testified that some of the units at the Puyallup facility were "not completely sealed" and she had seen water get inside a storage unit at that facility before. (Dkt. No. 22 at 32.)

After speaking with Higman, Martinez concluded that Plaintiff's loss was excluded from coverage because his policy excluded loss or damage caused by "'insects, rodents, or vermin.'" (Dkt. No. 23 at 2) (citation omitted). She sent a claim denial letter to Plaintiff on March 11, 2024, explaining that coverage was being denied because of (1) "lack of a covered peril[]" and (2) an "explicit exclusion" for "vermin, rodents, etc." (*Id.* at 10.) Plaintiff apparently called Martinez that same day and "expressed dissatisfaction" with the denial. (*Id.* at 2.) Martinez told

Plaintiff that if he provided a roof diagnostic report showing that the loss was a result of a covered peril, Defendant would reevaluate his claim. (*Id.* at 2–3.)

On July 9, 2024, Plaintiff sent Defendant an Insurance Fair Conduct Act ("IFCA") notice advising Defendant of its failure to conduct a reasonable investigation of the water loss prior to issuing a claim denial. (Dkt. Nos. 28 at 2; 28-5 at 1–4.)

**C. Plaintiff's Lawsuit**

Plaintiff filed this lawsuit in Pierce County Superior Court on August 21, 2024. (Dkt. No. 1-1 at 6.) He brought claims for breach of contract and three state statutory claims: violation of the insurer's duty of good faith, Washington Revised Code § 48.01.030; violation of IFCA, Washington Revised Code §§ 48.01.010 and 48.30.015; and violation of the Washington Consumer Protection Act ("CPA"), Washington Revised Code § 19.86. (*Id.* at 7–12.) On December 12, 2024, Defendant removed the case based on diversity jurisdiction because Plaintiff is a citizen of Washington and Defendant is a citizen of Texas.[1] (Dkt. No. 1 at 2–5.)

**D. Second Denial Letter**

While discovery was in process, Defendant sent Plaintiff a second denial letter. There are many questions about the second letter, including why a second denial was sent and why it took

---

[1] In the notice of removal, Defendant notes that Plaintiff did not state the specific amount of damages he allegedly sustained in his complaint. (Dkt. No. 1 at 3.) However, Plaintiff served responses to Defendant's initial set of written discovery requests on November 15, 2024, and at that point disclosed that he sought damages in excess of $75,000. (*Id.* at 2.) As Defendant notes, a party has 30 days to remove a case once the case becomes removable—in this case, when Plaintiff's discovery responses indicated he was seeking at least $82,200 in damages. (*Id.* at 2); *Fritsch v. Swift Transp. Co. of Ariz., LLC*, 899 F.3d 785, 788 (9th Cir. 2018) ("If the complaint itself does not provide a basis for removal, however, a defendant may file a notice of removal within 30 days after receipt of information 'from which it may first be ascertained that the case is one which is or has become removable.'") (quoting 28 U.S.C. § 1446(b)(3)). The Court is satisfied the amount in controversy requirement, and therefore the requirements for diversity jurisdiction, have been met, and that removal was timely.

so long for the letter to be produced in discovery. Plaintiff declares the new denial letter was sent "just days" after Defendant's representatives were deposed, and that the letter was sent directly to him via email. (Dkt. No. 28 at 3.) The letter apparently went to Plaintiff's spam inbox and he only became aware of it months later, when his attorney "instructed [him] to search all [his] inboxes for any correspondence from Defendant[.]" (*Id.*) Defendant produced the letter in its supplemental response to one of Plaintiff's discovery requests that was first sent on October 8, 2024. (Dkt. No. 27 at 2.) In his declaration, Plaintiff's counsel Anthony L. Reiner states he was not aware a second denial letter was sent until September 24, 2025. (*Id.* at 1–2.)

Defendant's proffered reason for the second denial letter is as follows: in June 2025, Adam Watson, who was the "manager overseeing the property claims adjusters responsible for handling Plaintiff's claim[]" at the relevant time, received a diagnostic report of the condition of the roof at Plaintiff's storage. (Dkt. No. 25 at 1–2.) The report was prepared by Rooftech, Inc. ("Rooftech") and was "commissioned by Public Storage in response to Plaintiff's report of water damage to his personal property." (*Id.* at 2.) A date on the report indicates it was prepared on March 6, 2024. (*Id.* at 2, 5.) Watson stated he was "unsure" why the report was not provided to Defendant in March 2024 after it was made. (*Id.* at 2.)

Nevertheless, Watson reviewed the report's findings, which stated "[n]o problems were observed at all on the roof above the unit, [and] the roof is in good condition." (*Id.* at 5.) Upon inspection of the storage unit, "the floor and ceiling of the unit [were] dry[.]" (*Id.*) The inspector hypothesized that "[t]his may be a condensation problem due to the cold and wet weather in winter." (*Id.*) The report includes various photos of Plaintiff's storage unit after it had been vacated. (*Id.* at 5–6.) Based on the report and his experience "interpreting similar renters policies," Watson determined Plaintiff's loss was excluded from coverage for two

reasons: "(1) the loss reported by Plaintiff did not meet the definition of 'water damage' as defined by the Policy; [and] (2) even if the damage were treated as water damage, loss caused by 'humidity or temperature changes' and 'fungi, mildew or mold' is excluded from coverage." (*Id.*) On June 24, 2025, Watson sent the second denial letter to Plaintiff based on these findings. (*Id.* at 2, 8–10.)

On January 8, 2026, Defendant filed its motion for summary judgment on all claims. (*See* Dkt. No. 21.) On January 12, Plaintiff filed his motion for partial summary judgment, requesting the Court (1) estop Defendant from relying on its "belated" June 24, 2025, claim denial letter and (2) grant summary judgment in Plaintiff's favor on his breach of contract claim. (Dkt. No. 26 at 5.)

## II SUMMARY JUDGMENT STANDARD

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt"). *See also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv. Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The court must consider the substantive evidentiary burden that the nonmoving party must meet at trial—in most civil cases, a preponderance of the evidence. *Anderson*, 477 U.S. at 254; *T.W. Elec. Serv. Inc.*, 809 F.2d at 630. The court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elec. Serv. Inc.*, 809 F.2d at 630 (relying on *Anderson*). Conclusory, non-specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–889 (1990).

## III DISCUSSION

### A. "Mend the Hold" Doctrine

As a preliminary matter, the Court must determine whether to grant equitable relief to Plaintiff via the "mend the hold" doctrine. In the insurance context, the "mend the hold" doctrine has been extended to "prevent insurers from shifting the grounds for non-performance from the reasons stated in the insurer's declination letter." *Karpenski v. Am. Gen. Life Cos., LLC*, 999 F. Supp. 2d 1235, 1245 (W.D. Wash. 2014); *see also Dentists Ins. Co. v. Yousefian*, Case No. C20-1076RSL, 2023 WL 4106220, at *12 (W.D. Wash. June 21, 2023) ("cases applying this doctrine typically deal with denials of liability[]") (collecting cases). In Washington, the doctrine "may be invoked to preclude insurers from introducing new or changed

bases for denying coverage once litigation has begun."[2] *Karpenski*, 999 F. Supp. 2d at 1245. To prevail, the insured must demonstrate they either "'suffered prejudice or the insurer acted in bad faith when the insurer failed to raise all its grounds for denial in its initial denial letter.'" *Id.* (citing *Hayden v. Mut. of Enumclaw Ins. Co.*, 1 P.3d 1167, 1171 (Wash. 2000) (en banc)). Importantly here, "'[a]n insurer is charged with the knowledge which it would have obtained had it pursued a reasonably diligent inquiry.'" *Karpenski*, 999 F. Supp. 2d at 1245 (citation omitted).

Plaintiff asks the Court to estop Defendant from "introducing new or alternative reasons for denying [his] policyholder's claim that were not raised in the initial denial letter," i.e., from relying on the reasons proffered in the June 2025 denial letter rather than the March 2024 letter to deny him coverage. (Dkt. No. 35 at 6.) Plaintiff argues he has both been prejudiced by Defendant's failure to raise all grounds, including excluded water loss, for the denial of his claim in its March 2024 letter, and that Defendant acted in bad faith in doing so. (Dkt. No. 26 at 11.) Defendant pushes back, arguing that Plaintiff cannot show he detrimentally relied on an initial coverage determination, and as a result, he suffered no prejudice. (Dkt. No. 32 at 9–11.) Defendant further notes its "failure to articulate every potential coverage defense in an initial denial letter does not constitute bad faith as a matter of law[.]" (*Id.* at 11–12.)

---

[2] The extent to which Washington state courts have explicitly adopted the mend the hold doctrine is not clear. *See Yousefian*, 2023 WL 4106220, at *12 (citing *McAlpine v. State Farm Fire & Cas. Ins. Co.*, 540 Fed. App'x 559, 560 (9th Cir. 2013) (citations omitted) ("Although Washington has never recognized the 'mend the hold' doctrine . . . its doctrines of waiver and estoppel are functionally similar."). However, the Washington Supreme Court has announced the similar "general rule" that if an "insurer denies liability under the policy for one reason, while having knowledge of other grounds for denying liability, it is estopped from later raising the other grounds in an attempt to escape liability, provided that the insured was prejudiced by the insurer's failure to initially raise the other grounds." *Bosko v. Pitts & Still, Inc.*, 454 P.2d 229, 234 (Wash. 1969). Regardless of the doctrine's exact definition, the Washington doctrines of waiver and estoppel are "functionally similar." *McAlpine*, 540 Fed. App'x at 560 (citing *Polson Logging Co. v. Neumeyer*, 229 F. 705, 708 (9th Cir. 1916) (citing *Zeimantz v. Blake*, 80 P. 822 (1905) (per curiam))); *Bosko*, 454 P.2d at 234.

Here, "[a]pplication of the factors for mend the hold estoppel precludes Defendant[] from changing [its] grounds for rescission from those that [it] stood on prior to the onset of litigation." *Karpenski*, 999 F. Supp. 2d at 1245. Defendant investigated Plaintiff's claim in March 2024 by reviewing photos submitted by Plaintiff and speaking with Higman, who advised Defendant that roof rats could have created holes in the roof of Plaintiff's storage unit. (Dkt. No. 23 at 2.) Defendant concluded, based on this information, that Plaintiff's loss was caused by "'insects, rodents, or vermin'" and therefore was not covered. (*Id.*) (citation omitted). The letter memorializing the denial was sent on March 8, 2024. (*Id.* at 10.) "Had there been additional bases for [denying] Plaintiff's coverage, [Defendant] should have notified Plaintiff of them at this stage[.]" *Karpenski*, 999 F. Supp. 2d at 1245–1246. Instead, the second denial letter—which provided three new bases for denial of coverage—was not sent until June 25, 2025, nearly a year after litigation commenced. (*See* Dkt. No. 25 at 2; *see also* Dkt. No. 1-1 (lawsuit filed in Pierce County Superior Court on August 21, 2024).) The insertion of the new denial letter into the lawsuit "effectively negated Plaintiff's litigation strategy[]"; for example, Plaintiff's counsel was unable to ask questions of Martinez and Watson (who was serving as Defendant's corporate representative) about the second basis for denial during their depositions. (Dkt. No. 26 at 11–12; 27 at 1.) Clearly, Plaintiff was prejudiced by Defendant "shifting grounds" because he brought his complaint based on the first denial letter and "prepared [his] case with the understanding that [his] claim was denied solely" on the basis of damage caused by roof rats. *Karpenski*, 999 F. Supp. 2d at 1246.

Defendant's argument that Plaintiff was required to detrimentally rely on a representation of coverage is disclaimed by *Yousefian*. There, the insured party argued that "'an insurer may not rely on one argument in making a coverage decision and then later, after litigation begins,

switch to a different argument, *if the policyholder relied on the insurer's initial position to its detriment*.'" 2023 WL 4106220, at *12 (emphasis added) (citation omitted). The court disagreed, noting that all the cases provided by the insured "present[ed] a distinct fact pattern, in which (a) an insured is denied coverage; (b) the insurance company informs the insured of the reason for denial in a denial letter; and (c) the insurance company later attempts to introduce an alternate rationale for denial in the course of litigation." *Id.* There was a difference, according to the court, in using an estoppel argument to "bind [the insurer] to its initial coverage determination, rather than its reason for denying coverage." *Id.* Similarly here, Plaintiff is not seeking to expand the scope of coverage, he is disputing the denial of coverage based on an "alternate rationale" that was introduced after he initiated this lawsuit. *Id.*; (*see also* Dkt. No. 35 at 3–4).

As the Court sees it, Plaintiff was prejudiced when Defendant denied coverage on one basis, and then after the Parties were enmeshed in litigation, denied coverage on new, independent bases. *See Karpenski*, 999 F. Supp. 2d at 1245; *Yousefian*, 2023 WL 4106220, at *12; *Oganessova v. Mut. of Omaha Life Ins. Co.*, Case No. C13-1443RAJ, 2014 WL 5782260, at *8 (W.D. Wash. Nov. 6, 2014). Even if ultimately the coverage determination does not change, Plaintiff still was prejudiced by Defendant's failure to raise "all its grounds for denial in its initial denial letter." *Hayden*, 1 P.3d at 1171. Defendant is therefore "'charged with the knowledge which it would have obtained had it pursued a reasonably diligent inquiry[,]'" *Karpenski*, 999 F. Supp. 2d at 1245 (citation omitted), but it may not rely on the second denial letter to deny coverage to Plaintiff. Essentially, the Court is proceeding as if the exclusions for humidity and temperature changes do not exist in Plaintiff's insurance policy because Defendant did not assert that such exclusions applied until after the litigation was initiated and well advanced. (*See* Dkt.

No. 28-1 at 20.) Plaintiff's partial motion for summary judgment is therefore GRANTED as to the application of the mend the hold doctrine. The Court takes no position on Plaintiff's argument that Defendant acted in bad faith in denying his claim as a separate basis for applying the mend the hold doctrine.

**B. Breach of Contract**

The Parties both moved for summary judgment on Plaintiff's breach of contract claim. (*See* Dkt. Nos. 21 at 13–17; 26 at 14–21.) Defendant argues its policy provides for water loss coverage in a narrow set of circumstances, and because Plaintiff's water loss does not fall within that narrow definition of "water," his breach of contract claim fails as a matter of law. (Dkt. No. 21 at 14–15.) Defendant's fallback argument—i.e., that even assuming the policy covered Plaintiff's water loss, coverage should still be excluded because of the carve-out provisions in the moving addendum—has been foreclosed by this Court already. *See* Section III(A)(1) *supra*. Plaintiff argues the commonly understood meaning of "water" should be used to interpret the insurance policy and moving addendum, and because Plaintiff's property loss was clearly caused by water, his loss should be covered as a matter of law. (Dkt. No. 26 at 15–20.)

The Court finds there are two distinct avenues for analyzing the breach of contract claim: first, through traditional contract interpretation; and second, through the duty of good faith and fair dealing. It addresses each in turn.

1. <u>Interpretation of the insurance contract</u>

Washington courts construe insurance policies as contracts. *Kut Suen Lui v. Essex Ins. Co.*, 375 P.3d 596, 599 (Wash. 2016) (en banc). When interpreting an insurance policy, courts "consider the policy as a whole" and give the policy "'a fair, reasonable, and sensible construction as would be given to the contract by the average person purchasing insurance.'" *Id.*

(citations omitted). The contract must be construed together "in order to give force and effect to each clause." *Feenix Parkside LLC v. Berkley N. Pac.*, 438 P.3d 597, 601 (Wash. Ct. App. 2019); *see also Kut Suen Lui*, 375 P.3d at 599 (If possible, courts should "harmonize clauses that seem to conflict in order to give effect to all of the contract's provisions."). If the policy language is "clear and unambiguous" it should be enforced as written; courts "may not modify it or create ambiguity where none exists." *Quadrant Corp. v. Am. States Ins. Co.*, 110 P.3d 733, 737 (Wash. 2005) (en banc). Interpretation of an insurance contract is a matter of law. *McDonald v. State Farm Fire & Cas. Co.*, 837 P.2d 1000, 1003 (Wash. 1992) (en banc).

Moreover, Washington courts construe insurance contracts "'according to the entirety of its terms and conditions as set forth in the policy, and as amplified, extended, or modified by any rider, endorsement, or application attached to and made a part of the policy.'" *Kut Suen Lui*, 375 P.3d at 599–600 (quoting Wash. Rev. Code § 48.18.520). "Policy ambiguities, particularly with respect to exclusions, are to be strictly construed against the insurer." *Hayden*, 1 P.3d at 1172.

*a. The insurance policy*

Plaintiff's policy includes an amendatory endorsement for the state of Washington. (*See* Dkt. No. 28-1 at 15.) The endorsement applies to the General Provisions (RP-1) and "all personal property contracts," including Plaintiff's general RP-3 contract. (*Id.* at 15, 34–43.) The endorsement provides, "FLOOD AND WATER in the . . . RP-3 contract[] is deleted and replaced by":

> a. Flood means:
>
> 1. the overflow of inland or tidal waters;
>
> 2. the unusual and rapid accumulation or runoff of surface waters from any source; or

> 3. mudslides which are proximately caused by the overflow of inland or tidal waters and are akin to a river or liquid and flowing mud on the surfaces of normally dry land areas including your residence, as when earth is carried by a current of water and deposited along the path of the current.
>
> b. Water means:
>
> 1. damage caused by water which backs up through sewers or drains;
>
> 2. damage caused by accidental escape of water from plumbing, heating, or air condition pipes, fixtures, or equipment or domestic appliances.
>
> We will not cover damage caused by gradual seepage of water through building or basement walls, roofs, windows, doors, foundations, or floors. This CAUSE OF LOSS does not include loss caused by or resulting from freezing except as provided in Item 15. FREEZING.

(*Id.* at 17–18.) Accordingly, the amendatory endorsement language is the operative version of Defendant's flood and water policy. *Kut Suen Lui*, 375 P.3d at 599–600 (citation omitted).

The endorsement also lists "ADDITIONAL COVERAGES," including a "MOVING AND STORAGE" policy, which provides:

> a. [Coverage] begins when YOUR PROPERTY PASSES INTO THE CUSTODY OF A PUBLIC CARRIER, INCLUDING United States government trucks, aircraft and vessels, or a storage facility. Your property must be under a bill of lading, a mover's contract, baggage check, or other form of shipping or storage document.
>
> This coverage ends:
>
> 1. when your property is delivered to your permanent or temporary address in accordance with the shipping document; or
>
> 2. when you take possession of your property from storage.
>
> b. provides coverage, in addition to the previously described CAUSES OF LOSS COVERED, for:
>
> 1. loss of your property if, when described under a bill of lading, mover's contract, baggage check, or other form of shipping or storage document, it cannot be located after a reasonable search;

2. loss or damage caused by the stranding, sinking, overturning, crashing, ditching, derailment, burning, or collision of a public conveyance;

3. loss or damage caused by water, except as excluded in c. below; and

4. your share of general average and salvage charges. These charges do not increase the amount shown on the Declarations Page for PERSONAL PROPERTY.

c. does not cover loss or damage caused by:

1. Breakage, marring, scratching, or handling;

2. Delay during shipment;

3. Humidity or temperature changes;

4. Fungi, mildew or mold;

5. Inherent defect of the property;

6. Insufficient packing or address; or

7. Insects, rodents, or vermin.

d. does not increase the amount shown on the Declarations Page for PERSONAL PROPERTY.

(Dkt. No. 28-1 at 19–20.) Similarly, the amendatory endorsement language provides the operative language for Defendant's moving and storage policy in this matter. *Kut Suen Lui*, 375 P.3d at 599–600 (citation omitted).

*b. The meaning of "water"*

Defendant argues the average policyholder would understand that coverage for damage caused by water is limited to the definition of "water" contained in the "FLOOD AND WATER" section of the policy. (Dkt. No. 21 at 14.) Put differently, Defendant argues coverage for damage caused by "water" is limited to "damage caused by water which backs up through sewers or drains" or "damage caused by accidental escape of water from plumbing, heating, or

air condition pipes, fixtures, or equipment or domestic appliances." (*See* Dkt. No. 28-1 at 18.) But as Plaintiff points out, if Defendant meant for this definition of "water" to apply to the entirety of the policy, including additional coverages and endorsements, it could have included the term "water" in the "GENERAL PROVISIONS" section, which contains a "DEFINITIONS" section of all terms that are meant to apply to the entirety of the policy. (Dkt. No. 29 at 12–13.)

Plaintiff also correctly points out that applying the definition of "water" contained in the "FLOOD AND WATER" section of the policy to the entirety of the policy results in obvious contradictions, including within the "FLOOD AND WATER" section itself. (*Id.* at 14–15.) To illustrate: if the definition of "water" is universal throughout the policy, "then the Policy's 'flood' coverage is necessarily limited to 'flood' events involving domestic 'water' or 'waters,' i.e., water originating from a plumbing system, household appliance, etc.[,]" which would be nonsensical. (*Id.* at 15–16.) Similarly, applying Defendant's narrow definition of "water" to the "watercraft" policy in the liability section renders language superfluous, because watercraft "are not used or designed to be used on domestic water (water that backs up through sewers or drains or escapes from plumbing equipment)." (*Id.* at 18) (emphasis omitted). This means the language excluding coverage for personal liability arising out of the use of a watercraft is meaningless.

Defendant's preferred meaning of "water" becomes even more confusing in the context of the "MOVING AND STORAGE" policy. That policy "provides coverage, in addition to the previously described CAUSES OF LOSS COVERED[.]" (Dkt. No. 28-1 at 20.) One of these "addition[al]" coverages is for "loss or damage caused by water," with certain exceptions. (*Id.*) It would make little sense for the policy to explicitly include *additional* coverage for water loss if, as Defendant argues, the narrow definition of covered water loss was already incorporated into the "MOVING AND STORAGE" policy. This would render superfluous the "loss or

damage caused by water" language in the moving addendum. *E.g.*, *Queen City Farms, Inc. v. Cent. Nat'l Ins. Co. of Omaha*, 882 P.2d 703, 727 (Wash. 1994) (en banc) (refusing to interpret insurance policy in a way that would cause some of its terms to be "superfluous" and "confusing [or] inconsistent"). Similarly, there would be no reason to characterize coverage for water loss specifically in the moving addendum as "additional" coverage if water loss is supposed to mean the exact same thing as it does in the main policy. "Courts may not adopt a contract interpretation that renders a term absurd or meaningless." *MacLean Townhomes, LLC v. Am. 1st Roofing & Builders Inc.*, 138 P.3d 155, 157 (Wash. Ct. App. 2006).

With all this in mind, the Court finds the policy's definition of "water," particularly in the context of water loss in the "MOVING AND STORAGE" section, is "fairly susceptible to different, reasonable interpretations and is, therefore, ambiguous." *Am. Nat'l Fire Ins. Co. v. B&L Trucking & Constr. Co., Inc.*, 951 P.2d 250, 256 (Wash. 1998) (en banc). If Defendant wished to limit coverage for water damage in the "MOVING AND STORAGE" policy to the same narrow definition of "water" contained in the "FLOOD AND WATER" coverage of the main policy, it could have included language to that effect. Likewise, if Defendant wanted its narrow definition of "water" to apply to the entire policy, it could have said so. The average person purchasing insurance would likely read "loss or damage caused by water" in the "MOVING AND STORAGE" policy to mean that, unless their water loss fell within one of the specifically enumerated exclusions, it would be covered by Defendant "in addition" to any other applicable coverage provisions in the remainder of the policy.[3] *Kut Suen Lui*, 375 P.3d at 599

---

[3] As a brief aside, the Court is proceeding as if the exceptions for humidity and temperature changes are not part of the policy. *See* Section III(A) *supra*. It includes this fact for the limited purpose of explaining how an average policyholder would likely understand the MOVING AND STORAGE policy as it pertains to water damage.

(citations omitted). "Because the language is, at the least, ambiguous, and because we discern no extrinsic evidence from the record indicating an intent by both parties to exclude coverage, we must resolve the ambiguity in favor of the insured." *Am. Nat'l*, 951 P.2d at 256; *see also Quadrant Corp.*, 110 P.3d at 737 ("Any ambiguity remaining after examination of the applicable extrinsic evidence is resolved against the insurer and in favor of the insured.").

The Court agrees with Plaintiff that "water" should be given its commonly used meaning. (Dkt. Nos. 26 at 15–16; 29 at 12.) In Washington, courts give undefined terms their "'plain, ordinary, and popular meaning.'" *Kitsap Cnty. v. Allstate Ins. Co.*, 964 P.2d 1173, 1178 (Wash. 1998) (en banc) (citation omitted). "To determine the ordinary meaning of undefined terms, courts may look to standard English dictionaries." *Id.* Webster's Dictionary defines "water" as, relevant here, "a particular quantity or body of water[.]" *Water*, Merriam-Webster's Collegiate Dictionary (10th ed. 2025). Dictionary.com defines it as "a special form or variety of this liquid, such as rain." *Water*, DICTIONARY.COM, https://www.dictionary.com/browse/water (last visited July 16, 2026). Accordingly, these commonly understood definitions will be applied to the term "water" in the "MOVING AND STORAGE" policy. Plaintiff's motion for summary judgment as to the interpretation of the term "water" is therefore GRANTED. Defendant's motion for summary judgment as to the proper interpretation of the term "water" is DENIED.

However, the Court declines to find on summary judgment that the scope of Plaintiff's loss is covered by the insurance policy. (*Cf.* Dkt. No. 26 at 20–21.) The present record is insufficient to determine if all, some, or none of Plaintiff's property damage was caused by rodents, water, some combination of the two, or something else. Plaintiff's video shows some items that appear to be wet, but the ceiling and walls of the storage unit appear dry, and it is difficult to determine the condition of the storage unit generally because Plaintiff moved around

significantly while filming. (*See* Dkt. No. 31.) There also does appear to be some damage caused by rodents. (*Id*.) Furthermore, Plaintiff has no expert that examined his property to determine the cause of loss, nor a ledger recording which of his items suffered water damage. Therefore, while the Court agrees that "water" should be given its plain and ordinary meaning, it cannot say as a matter of law that Plaintiff's loss qualifies as covered water loss within the "MOVING AND STORAGE" policy. Plaintiff's motion for summary judgment as to the coverage of his claim is DENIED. Defendant's motion for summary judgment on the lack of coverage for Plaintiff's claim is likewise DENIED.

2. <u>Breach of the implied covenant of good faith and fair dealing</u>

Separately from the standard breach of contract analysis, Plaintiff argues Defendant violated the duty of good faith and fair dealing because it denied Plaintiff's claim once it determined the water loss could have been caused by rats chewing holes through the roof of the storage unit, which permitted water to enter, despite not ever investigating in person. (Dkt. No. 29 at 20–21.) The Washington Supreme Court has held, "'[t]he implied covenant of good faith and fair dealing in the policy should necessarily require the insurer to conduct any necessary investigation in a timely fashion and to conduct a reasonable investigation before denying coverage.'" *Coventry Assoc. v. Am. States Ins. Co.*, 961 P.2d 933, 938 (Wash. 1998) (en banc) (citation omitted). "'In the event the insurer fails in either regard, it will have breached the covenant and, therefore, the policy.'" *Id.* (citation omitted). In the insurance context, the duty of good faith "implies 'a broad obligation of fair dealing' . . . and a responsibility to give 'equal consideration to the insured's interests." *Tank v. State Farm Fire & Cas. Co.*, 715 P.2d 1133, 1136 (Wash. 1986) (en banc) (quoting *Tyler v. Grange Ins. Ass'n*, 473 P.2d 193, 197, 199

(Wash. Ct. App. 1970)). That duty has also been codified by the Washington legislature. *See* Wash. Rev. Code § 48.30.010.

Here, the Court finds there is a question of fact as to whether Defendant breached its duty of good faith and fair dealing (and by extension, breached the contract) by unreasonably denying coverage based on its alleged failure to conduct a reasonable investigation. Martinez, the claims adjuster who denied Plaintiff's claim, investigated Plaintiff's claim as follows: (1) she reviewed photos from Plaintiff that showed the water damage to his property and (2) she spoke with Higman about the roof rats that "could have created holes" in the roof of the storage unit. (Dkt. No. 23 at 2.) Based on this sparse investigation, Martinez determined Plaintiff's loss was excluded from coverage and issued a denial letter. (*Id.*) As identified by Plaintiff, no employee of Defendant ever came to physically inspect the storage unit, nor did someone ever try to corroborate whether a leak in the ceiling of the unit in fact existed, and if it did, whether it was caused by rats. (Dkt. No. 28 at 2.) Martinez's complete reliance on Higman's word that there were roof rats at the storage unit, without any further investigation, arguably does not "equall[y] consider[]" Plaintiff's interests underlying his decision to hold renter's insurance to begin with. *Tank*, 715 P.2d at 1136. Such a failure to investigate means Plaintiff "[did] not receive the full benefit due under [his] insurance contract." *Coventry*, 961 P.2d at 938. Put another way, a reasonable jury could conclude Defendant's conduct "erode[d] the security purchased by the insured[,] which breaches the insurer's duty to act in good faith." *Id.* at 939.

Ultimately, it does not matter that there is no evidence in this record that the water damage was caused by anything other than condensation or humidity. Such a finding does not preclude a breach of contract claim premised on the breach of the covenant of good faith and fair dealing by failing to reasonably investigate. *See id.* at 940 ("Although coverage was eventually

shown to be excluded under the policy, [Defendant] still breached its contract with [Plaintiff] by acting in bad faith and, thus, harming [Plaintiff].”). Here, had Defendant investigated reasonably, it would have learned that the roof of the storage unit was in fact in good condition and denied Plaintiff's coverage grounds differently than the original denial of coverage.[4] (*See* Dkt. No. 25 at 2.) But instead, Defendant stopped its investigation once it heard Higman's theory that roof rats caused the water to breach the unit—without any attempt to confirm or deny that theory. (Dkt. No. 23 at 2.) Because the “[f]ailure to adequately investigate, if proven, would constitute a breach of contract[,]” *Wall v. Country Mut. Ins. Co.*, 319 F. Supp. 3d 1227, 1235 (W.D. Wash. 2018), Defendant's motion for summary judgment on Plaintiff's breach of contract claim is DENIED.

**C. Bad Faith[5]**

The discussion of Plaintiff's breach of contract claim leads directly into Plaintiff's bad faith tort claim. *See Or. Mut. Ins. Co. v. Seattle Collision Ctr., Inc.*, Case No. C08–1670JLR, 2009 WL 3067036, at *9 (W.D. Wash. Sept. 18, 2009) (citing *Smith v. Safeco Ins. Co.*, 78 P.3d 1274, 1276 (Wash. 2003) (en banc)) (“Breach of the duty of good faith may give rise to a tort action for bad faith.”). A plaintiff bringing a bad faith tort claim must show “the insurer's breach of the insurance contract was unreasonable, frivolous, or unfounded.” *Smith*, 78 P.3d at 1277.

---

[4] Indeed, the Rooftech report seems to *undermine* Defendant's position that the first investigation was reasonable, because the report identified “[n]o problems were observed at all on the roof above the unit, [and] the roof is in good condition.” (Dkt. No. 25 at 5.)

[5] Defendant correctly notes in its summary judgment motion that there is no private right of action for violation of Washington Revised Code § 48.01.030 as pled in Plaintiff's complaint. (Dkt. No. 21 at 21.) However, Defendant acknowledges the complaint “references the elements of a common-law bad faith claim” and proceeds to address that claim on the merits. (*Id.* at 22.) In response, Plaintiff proceeds with a common law bad faith claim without mention of § 48.01.030. (Dkt. No. 29 at 20–25.) The Court will construe Plaintiff's second claim for relief (*see* Dkt. No. 1-1 at 8–9) as a common law bad faith tort claim rather than as a claim for violation of § 48.01.030.

As with any other tort claim, the plaintiff must also "prove duty, breach of duty, and damages proximately caused by any breach of duty." *Werlinger v. Clarendon Nat. Ins. Co.*, 120 P.3d 593, 595 (Wash. Ct. App. 2005). "Whether an insurer acted in bad faith is a question of fact." *Smith*, 78 P.3d at 1277. Relevant here, "an insurance company can be held liable for bad faith and unreasonable conduct in the investigation and denial of a claim even where it ultimately turns out that there was no coverage." *Wall*, 319 F. Supp. 3d at 1233; *see also Coventry*, 961 P.2d at 934 (the issue presented is whether a bad faith claim may be premised on a bad faith investigation, even if "the denial of coverage was ultimately determined to be correct[]").

At the summary judgment stage, courts review bad faith claims under the following standard:

> If the insured claims that the insurer denied coverage unreasonably in bad faith, then the insured must come forward with evidence that the insurer acted unreasonably. The policyholder has the burden of proof. The insurer is entitled to summary judgment if reasonable minds could not differ that its denial of coverage was based upon reasonable grounds. If, however, reasonable minds could differ that the insurer's conduct was reasonable, or if there are material issues of fact with respect to the reasonableness of the insurer's action, then summary judgment is not appropriate. If the insurer can point to a reasonable basis for its action, this reasonable basis is significant evidence that it did not act in bad faith and may even establish that reasonable minds could not differ that its denial of coverage was justified.

*Or. Mut.*, 2009 WL 3067036, at *9 (quoting *Smith*, 78 P.3d at 1277–1278 (internal citations omitted)).

The sole question before this Court is whether Plaintiff has created a material question of fact as to whether Defendant breached its duty to investigate in good faith. The same analysis underpinning the breach of the duty of good faith and fair dealing is applicable here. Viewed in favor of Plaintiff, the evidence confirms Defendant did not ever physically examine Plaintiff's storage unit to determine whether the water damage was in fact caused by roof rats. (Dkt. Nos.

23 at 2; 28 at 2; *see also* Dkt. No. 21 at 18 ("Although [Defendant] did not send a field adjuster on site, [it] reviewed numerous photos of the damage and communicated with Public Storage regarding the state of the storage unit and ongoing issues related to rodent infestations.").) Indeed, Martinez herself explained that after hearing Higman's suggestion that roof rats had chewed holes in the ceiling and let water in, she concluded her investigation and issued the denial letter. (Dkt. No. 23 at 2.) Though there is an explicit coverage exclusion for damage caused by rodents in Plaintiff's contract (*see* Dkt. No. 28-1 at 20), reasonable minds could differ on whether denying coverage based on this exclusion—without first inspecting the storage unit and confirming whether in fact the damage was caused by rodents—was reasonable. The findings in the Rooftech report underscore this conclusion. Had someone from Defendant inspected the roof, they likely would have noticed the same things as the inspector, i.e., that "[n]o problems were observed at all on the roof above the unit, [and] the roof [was] in good condition." (Dkt. No. 25 at 5.) Therefore, it seems possible that "further investigation of factual materials would have led to a different understanding or result." *Or. Mut.*, 2009 WL 3067036, at *9 (citing *Am. Best Food, Inc. v. Alea London, Ltd.*, 158 P.3d 119, 129 (Wash. Ct. App. 2007)).

Defendant argues Washington law "does not support Plaintiff's attempt to establish bad faith as a matter of law" based on an insurer's "failure to articulate every potential coverage defense" in the denial letter. (Dkt. No. 32 at 11.) But *Smith* counsels that in Washington, a policyholder is not required to prove bad faith as a matter of law in order to overcome the insurer's motion for summary judgment on a bad faith claim. 78 P.3d at 1277. This would create a "special burden for policyholders" or a "special standard[] of summary judgment to benefit insurers accused of bad faith." *Id.* Looking at the facts in the light most favorable to Plaintiff, the Court concludes a reasonable jury could find that Defendant did not act reasonably

in denying coverage based on roof rats without doing an investigation into the actual cause of Plaintiff's property damage. Defendant's motion for summary judgment is accordingly DENIED as to Plaintiff's bad faith claim.

**D. IFCA Violation Claim**

"IFCA provides a cause of action to a 'first party claimant to a policy of insurance who is unreasonably denied a claim for coverage or payment of benefits by an insurer[.]'" *Seaway Props., LLC v. Fireman's Fund Ins. Co.*, 16 F. Supp. 3d 1240, 1254 (W.D. Wash. 2014) (quoting Wash. Rev. Code § 48.30.015(1)). IFCA does not "create a [separate] cause of action for regulatory violations." *Perez-Crisantos v. State Farm Fire & Cas. Co.*, 389 P.3d 476, 482 (Wash. 2017) (en banc); *see also Seaway*, 16 F. Supp. 3d at 1255 ("The right to sue [under IFCA] arises solely from an unreasonable denial of a claim for coverage or payment of benefits."). If the insured shows the insurer unreasonably denied a claim for coverage or unreasonably denied payment of benefits, a claim exists under IFCA, and the court may "'increase the total award of damages to an amount not to exceed three times the actual damages.'" *Ainsworth v. Progressive Cas. Ins. Co.*, 322 P.3d 6, 20 (Wash. Ct. App. 2014) (citing Wash. Rev. Code § 48.30.015(2)). However, violations of the Washington Administrative Code, alone, are insufficient to establish an IFCA violation. *Wall*, 319 F. Supp. 3d at 1234. Rather, "[r]egulatory violations matter only when deciding whether to award attorney fees or enhance damages." *Seaway*, 16 F. Supp. 3d at 1255.

Defendant argues "there is no question of material fact that [it] reasonably denied Plaintiff's claim for coverage under the Policy." (Dkt. No. 21 at 17.) But as discussed, in viewing the evidence in the light most favorable to Plaintiff, the Court cannot say whether Defendant's investigation was reasonable as a matter of law. The evidence indicates, and

Defendant has reiterated, that no employee of Defendant ever physically inspected Plaintiff's storage unit before denying him coverage. (Dkt. Nos. 21 at 18; 23 at 2; 25 at 2.) Defendant merely accepted Higman's theory that roof rats had chewed holes in the ceiling of the storage unit, which reportedly led to the water damage. (Dkt. No. 23 at 2.) It is a question for the jury whether it was reasonable for Defendant to deny coverage under those circumstances.

In his complaint, Plaintiff separately lists 11 administrative rules Defendant allegedly violated and alleges Defendant "engag[ed] in unfair methods of competition and unfair or deceptive acts in the handling, investigation, and adjustment" of Plaintiff's insurance claim in violation of IFCA. (*See* Dkt. No. 1-1 at 9–11.) Defendant addresses the purported regulatory violations in its motion for summary judgment in three categories: "(1) failure to conduct a reasonable investigation; (2) failure to timely and transparently communicate with Plaintiff; and (3) failure to effectuate a fair, prompt, and equitable settlement of the Claim." (Dkt. No. 21 at 17–19.) It argues Plaintiff's attempt to establish an IFCA violation premised on these regulatory provisions is "futile." (*Id.* at 20.) At this stage, the Court sees no reason to determine whether any Washington regulatory violations were violated because it has already determined there is a question of fact as to whether Defendant unreasonably denied Plaintiff's claim for coverage. *See Perez-Crisantos*, 389 P.3d at 683 ("IFCA makes regulatory violations relevant to the apportioned attorneys' fees and damages associated with that derivative violation."). In conclusion, summary judgment on Plaintiff's IFCA claim is DENIED. To the extent necessary, attorney fees and IFCA damages will be determined at a later date.

**E. Washington CPA Claim**

"[U]nfair or deceptive acts or practices in the conduct of any trade or commerce" are unlawful under the CPA. Wash. Rev. Code § 19.86.020. "An insured may invoke the CPA

against an insurer" if the insurer violates Washington Revised Code § 48.30.010 or the provisions of Washington Administrative Code § 284-30-330.[6] *Oregon Mut.*, 2009 WL 3067036, at *11 (citing *Indus. Indem. Co. of the Nw., Inc. v. Kallevig*, 792 P.2d 520, 530 (Wash. 1990) (en banc)); *see also Perez-Crisantos*, 389 P.3d at 685 ("[a] CPA claim can be predicated on a violation of" § 284-30-330). A CPA action requires "(1) an unfair or deceptive practice, (2) in trade or commerce, (3) that impacts the public interest, (4) which causes injury to the party in his business or property, and (5) which injury is causally linked to the unfair or deceptive act." *Anderson v. State Farm Mut. Ins. Co.*, 2 P.3d 1029, 1033 (Wash. Ct. App. 2000) (citing *Kallevig*, 792 P.2d at 528)).

The first three prongs of Plaintiff's CPA claim are easily established. Defendant argues it reasonably denied coverage to Plaintiff based on a correct interpretation of the insurance contract, which constitutes a complete defense to Plaintiff's CPA violation claim. (Dkt. No. 21 at 20) (citing *Shields v. Enterprise Leasing Co.*, 161 P.3d 1068, 1074 (Wash. Ct. App. 2007)). But violation of Washington Administrative Code § 284-30-330 constitutes a per se unfair trade practice, satisfying the first prong of the test. *Kallevig*, 792 P.2d at 529. As discussed, there is a question of fact as to whether Defendant conducted a reasonable investigation of Plaintiff's loss before denying coverage, fitting within the prohibition in § 284-30-330, which is the "determinative question" in light of all facts and circumstances in the case. *Anderson*, 2 P.3d at 329–330. The second prong is established as a matter of law because the "subject matter of this action involves insurance contracts, a commercial transaction." *Bryant v. Country Life Ins. Co.*,

[6] Washington Administrative Code § 284-30-330 identifies various definitions of "unfair methods of competition and unfair or deceptive acts of the insurer in the business of insurance, specifically applicable to the settlement of claims[.]" It prohibits, among other things, "[r]efusing to pay claims without conducting a reasonable investigation[.]" *Id.* § 284-30-330(4).

414 F. Supp. 2d 981, 1003 (W.D. Wash. 2006). And the third prong is met because CPA claims "alleging unfair insurance claims practices meet the public interest element because [Washington Revised Code §] 48.30.010 declares that the 'business of insurance is one affected by the public interest.'" *Anderson*, 2 P.3d at 1033 (quoting § 48.30.010); *see also Dees v. Allstate Ins. Co.*, 933 F. Supp. 2d 1299, 1311 n.11 (W.D. Wash. 2013) ("If a plaintiff proves an insurance company acted in bad faith, they also establish the first three prongs of the . . . CPA test.").

The "deprivation of contracted-for insurance benefits is an injury to 'business or property[]'" sufficient to satisfy the fourth element. *Peoples v. United Servs. Auto. Ass'n*, 452 P.3d 1218, 1222 (Wash. 2019) (en banc). And Washington courts "recognize that expenses incurred to investigate a deceptive act or practice are cognizable injuries and damages under the CPA." *Id.* at 1223–1224 (collecting cases). Here, Defendant argues Plaintiff cannot articulate how Defendant's handling of the claim caused Plaintiff to incur any costs. (Dkt. No. 21 at 21.) However, the record establishes Plaintiff incurred certain expenses as a result of Defendant's bare-bones investigation. For example, Plaintiff hired counsel to send Defendant an IFCA notice in July 2024 describing the water loss and criticizing Defendant's investigation (Dkt. Nos. 28 at 2; 28-5) and then initiated this lawsuit in August 2024 (Dkt. No. 1-1). Further, Plaintiff was forced to change his litigation strategy in June 2025, when Defendant sent the second denial letter. (Dkt. Nos. 27 at 1–2; 28 at 3.) Such litigation costs clearly flow from Defendant's initial denial of coverage incorrectly premised on the presence of roof rats. The Court concludes, therefore, that there is sufficient evidence to send Plaintiff's CPA claim to the jury and to deny summary judgment for Defendant. *See Coventry*, 961 P.2d at 940 ("[Plaintiff] is entitled to make a claim for those amounts and damages nominally associated with bad faith and CPA violations."); *West Beach Condo. v. Commonwealth Ins. Co. of Am.*, 455 P.3d 1193, 1200 (Wash.

Ct. App. 2020) (holding that the trial court erred in not allowing the jury to determine whether the damage at the plaintiff's property was caused by covered perils and if so, whether the defendant unreasonably denied coverage and violated the CPA in doing so).

## IV CONCLUSION

Accordingly, Defendant's motion for summary judgment (Dkt. No. 21) is DENIED in full. Plaintiff's partial motion for summary judgment (Dkt. No. 26) is GRANTED in part and DENIED in part. Defendant is estopped from asserting the specific exclusions contained in its June 24, 2025 claim denial letter. The Court will apply the plain and ordinary meaning of "water" to the additional coverage for "MOVING AND STORAGE." However, the Court finds there are questions of fact as to Plaintiff's breach of contract claim as explained in this order and therefore DENIES Plaintiff's request for summary judgment on this claim.

The Parties are ORDERED to confer and submit a joint status report by **August 3, 2026**, informing the Court of their upcoming availability for trial through the remainder of the year and the beginning of 2027 so the Court may issue a new trial schedule.

Dated this 20th day of July 2026.

David G. Estudillo
United States District Judge